before us this morning is United States v. Ross, 19-7008. Good morning, Your Honors. William Campbell on behalf of the appellant, Mr. Ross. The issues that I think are important this morning in oral argument initially has to do with what I think is the frightful way that one particular Pontotoc County deputy orchestrated and engineered what I contend, and the appellant contends, were illegal searches of his residence and property. Can you pull the microphone up closer to your mouth, please? You're very tall. Thank you. The court may recall that this incident began with an illegally parked vehicle on a country more than that until this deputy, and I think her last name is Wiggerson, I'm not sure, I wasn't there, so that's my poor attempt at identifying her, heard on the radio that the trailer and truck belonged to the appellant, Mr. Ross. The radio call set into motion a series of completely unrelated acts by this deputy. She went to the scene where the truck was parked. Roughly simultaneously as her arrival, Mr. Ross and his family were leaving the residence, and to try to help the court comprehend the topography or geography of this location, we have one road that's an east-west, basically straight line road. Then we have a north- south road that sort of curves around and goes to the north and up a ways, and I put in the brief the distance, I think it's about three-quarters of a mile, something like that. There's a cattle guard. Well, the southern half of that from the cattle guard south is one of those county roads, and north of that, that's a private road that's on Ross family property. There's more than one Ross family that lives on that property, Carl Martin being just one of the three, as I recall, that live up there. But she gets out there, and now she's got this agenda all her own. It has nothing to do with that. She understands that he's gone by in a car with his family. She then radios the Ada Police Department to find a reason to stop him, which the allegation was there was a speeding. That's, in my experience, a rarely exercised thing in Oklahoma, if you've got an Oklahoma license plate. But let me let me ask you this. I thought she had information that he was believed to be involved in trafficking and stolen merchandise, right? What we have is an allegation that she says that another deputy from some other county was told by somebody else that there was property there. Well, I'm not saying she had probable cause, but she had some information to believe that he might have been trafficking stolen merchandise. Right, that was the assertion, yeah. Okay. She also had information that he might be involved in selling methamphetamines. I'm sorry? She also had information he might be involved in selling methamphetamines. That's what she claimed, yes. However, what she did, rather than going and getting a warrant on this information, was that she has this Ada Police Department police officer not only stop the vehicle, she then wants him arrested and detained. She does that so that she can take a really agencies. We have her with the Pontotoc County. We have a white horse police. We have a game ranger, and we have another deputy. She takes them up to the property. Our contention is that when she crossed that first cattle guard, she was no longer, nor were they, on the county road at that point. That road goes north another quarter mile or so, and then it splits, and the right fork goes to Marty Ross's property. There is a second cattle guard there, and to get on to his particular little portion where the house and barn and stuff were requires another crossing of that. The allegation was that they observed these items from quote, the county road. They did not. They were on a private road on private property. The court made a factual finding that in fact they did observe at least the red ATV from the county road, right? The court made that finding. And what basis do we have to hold that finding to be clearly erroneous in the record? In the briefing, your honor, I don't think the government contested that fact. We asserted that that was a private road, and that I know the court found that the district court level, I think that was erroneous on the court's part. I understand you think that, but if there's nothing in the record that says that would allow us to reject that finding, then we have a finding of her seeing a red ATV, maybe not the red ATV, but she has a suspicion she's involved in stolen property. There is an allegation of stolen property involving a red ATV, and she sees the red ATV from public land. I mean that's what we have as a finding, right? Well, I think there's an affidavit in the appendix, your honor, that was done by Mr. Ross that would refute that. It was certainly contested, and I think that if it's, I understand the court's position here on the finding of the court, but I think if the finding is clearly erroneous, then this court can correct that erroneous finding. Well, it can, but it would have to have something that would undermine it, and the point we have here is we had testimony from the officer, and correct me, but I think she said she saw it, right? I'm sorry, your honor? We have testimony from, not from the officer actually, we had testimony from, did we have testimony from the officer at the hearing? I thought we had testimony from somebody reporting what she said. Okay, so we'll clarify hearings here. Yes, yes, that's what I'm talking about. At the suppression hearing, what we had was ATF agent Clack. Yes, okay. He testified to what he was told by other people. And what he was, what he reported having seen it, right? Correct. Okay, and granted we have this hearsay transmission of the information, but the district court judge, under the circumstances that were presented, did not question that recitation, right? Correct. Okay, let me move off of that subject for a quick second. Let's just take for the moment the spotting of the I mean, you talk about you make a lot out of, you know, well, they went on private property, but if she had suspicions about stolen property, she had suspicions about methamphetamine, you talk about shifting rationale, well, it doesn't matter. Anyone, pick them, you know, and she had the abandoned car. Why couldn't she go up to that house, even if she knew he had been detained? Somebody else could be at the house. Why couldn't she just walk up to the house and ask somebody? Because I think the testimony is that the officer doing that hasn't had the person they want to go talk to arrested and detained some miles away. She doesn't know that someone else is not in the house, and you know that law enforcement can go up to house. What if there's somebody else in the house who would be? Well, what if she doesn't know there is anybody else in the house, right? Well, I think the testimony was, and the record shows, that when the white car, the Murano, as I recall, went by, that this was Marty Ross and his family that left. Now, whether or may have been a residual person, I don't think the record says one way or the other, but certainly it looked like everybody was leaving. But isn't, isn't that, counsel, isn't, isn't that the point? Isn't that the point that there there could have been someone at the house? Possibly, possibly. Isn't that enough to justify going up and checking things out? There's an abandoned car, there's this other information, maybe the family's with Mr. Ross, but as long as there's a possibility of somebody being home, isn't that enough? I don't know that it is. If you want to talk to Marty Ross, he's the one who's alleged to have been doing these things. She hasn't said that it's Marty Ross and his family, or Marty Ross and Confederates, or Marty Ross and others. She's only said that it's Marty Ross who's doing this. If she wants to know what's going on, he has the central character in her narrative. Okay, let me give you this hypothetical. She, she is staking out Marty Ross's house, okay? She knows that his wife is at the house. She waits till Marty Ross leaves, and then she goes and talks to the what? That's, law enforcement does that all the time. Why is what, they, they, under the notion that, look, the wife, they're hoping anyway, is going to be more amenable to them talking to her and letting them in the house. The case law has supported that. You can do that, right? And I think that that scenario is absolutely... Well then, why is that scenario, in some ways, that scenario gives you knowledge that the wife's at the house, but, but the point is, if there's a possibility someone's at the house, where I thought I heard you going was, well, Marty Ross is the central focus, so why didn't she talk to him? Well, under my hypothetical, Marty Ross was still the central focus, but she didn't want to talk to him. She figured she, she figured she'd get some more information by talking to the wife or talking to somebody else. Why isn't that still work? The only difference is, in my hypothetical, it was certain she was there, but, but it could well be that the possibility is enough to go and try to find out, right? Well, again, I think that there is a character difference between what she did and your rather acceptable hypothesis of, if she had done it that way, I think that would be acceptable. If she wanted to watch, wait to see, and then go talk to somebody, I think you're absolutely correct in that, but I think where she orchestrates things the way she did, then that's where she runs afoul of this, because it was all a subterfuge. Was there any evidence as to whether she knew, and I, and if you want to proceed on this line, that's fine, I don't want to take up all your time in this particular issue, but when, was there any evidence that she knew who was in the car in addition to him? In other words, we talked about Marty Ross and his family, was it, did, I mean, basically, you know, windows can be tented, that kind of thing, so you could have a situation where she didn't know who was in the car. I mean, was there any evidence as to what she knew about who was in the car? That's a possibility that she didn't know. I think the record tells us specifically. If I could, let me quickly move on to the non-trial. The situation that they had was that Mr. Ross executed stipulations, he executed a waiver of jury, and his trial counsel then attempted to essentially redo the motion to suppress hearing. I think that the transcript of proceedings is clear, that Judge White understood what Mr. Cook was trying to do at that point in time, that he wasn't sure that he would be able to stop him, I think was Judge White's terms, and he really didn't know how he could go about it, but that's essentially what he was doing when he could get the witnesses there that he thought was going to be at the original suppression hearing, and he did subpoena people, which he did not do at the beginning. Well, counsel, I take it this argument is going to the sentencing issue on acceptance of responsibility. Is that where this is going? But couldn't counsel have subpoenaed those same people for the suppression hearing? He could have, yes, your honor. And therefore, didn't this put the court and everyone else to the burden of a second proceeding that wasn't really necessary because everybody could have been brought into the first proceeding? That would have been the more efficient way to do it, certainly, but I don't think the fact that he was permitted to do this because he didn't contest the essential elements of the offense. Well, I don't think the question is whether it was appropriate to permit him or not permit him to do it, but the fact that it happened cuts against, doesn't it, the acceptance of responsibility in the sense that the court, the government, were all put to the burden of an additional proceeding? That's not exactly how I read that 3E guideline. I think that what the guideline says has to do that it's the two levels of acceptance is awardable unless you put factual matters as to guilt or innocence in play in that hearing, which he did not do. I understand your argument. Can I just ask another question that goes back to the search issue? Why wasn't Mrs. Ross's consent to search the property sufficient to justify what happened here? First, I think that the fact that her alleged consent occurred after they had already searched, it became superfluous. Well, no, no. There was the written consent, but there was the initial spoken consent, and at the bench trial she was asked, and I'm going to read it to you, in terms of these particular officers, did they ask you for consent to search or did you offer? Answer, I offered. Why isn't that enough to justify the consent of the home, or justify the search of the home? Well, at any rate, though, according to the record, they didn't rely on that consent. Why, does that even matter? As long as there's a basis for the search, why isn't that what counts? Don't we evaluate the search from the objective, reasonable officer's standpoint, whether they relied on it or not? If there was a consent, wouldn't a reasonable officer be justified in Before you leave the podium, one question. Even if we were to eliminate all the information from the warrant affidavit that they learned after they went to the house, did they have enough for probable cause to search based on what they knew before they left the county road? I don't believe so. I think the remainder of that affidavit was information that was too old and too proper probable cause at that time. Does it matter whether the deputy could see one of the four-wheelers from the county road? No, because at that point in time she wasn't able to specifically identify whether or not that was in fact a stolen item. Do you need to actually have the VIN number in order to have probable cause? I don't know that you necessarily have to have a VIN number, but I think you have to have something that identifies it that's readily apparent and available to the officer. It can't just be just pick a 1957 green and white Chevy. I mean, you know, there's millions of those, so there has to be something distinguish it to show that that particular 1957 green and white Chevy is in fact stolen. There's something more than just the identification of a mass manufactured product. I understand your argument. Thank you, counsel. May it please the court, my name is Linda Epperle. I represent the government in this matter. This is a case in which there was extensive litigation below about the proprietary nature and whether or not the search was proper. We believe that there was no Fourth Amendment violation. Let me interrupt. Yes, your honor. There was a stipulation before the district court and the district court found that the four-wheelers were on the or an implicit license to walk up to the door, knock on the door, wait, and if nobody's there, turn around and leave. What allowed the officers to walk into the curtilage of the home, which under Collins we know is akin to opening the front door of the house, walk over to the ATVs, take pictures, and write down the VIN numbers? Wasn't that a violation? No, it was not, your honor. And why not? Because, for multiple reasons. As the court found below, let me start with the knock and talk. There was, yes, an inherent and implied license for someone to be able to go up and knock on the door in that situation. Certainly, at that point, they would have seen at least the red ATV. There was also testimony below in a finding by the court that that red ATV was seen from the road. There is also testimony from the court below that there was consent that was never revoked and that the affidavit that was ultimately used to obtain a search warrant in this case was sufficient. So there are multiple grounds. Let's break that out, because you've packed in a lot there. As I read the testimony, the oral consent, she drove up after the officers were already there, and it appears, although it's unclear from the record, after they had already walked into the curtilage, taken pictures, and written down the VIN numbers. If that's true, is there a violation of the Fourth Amendment here? No. And again, I get that you're arguing there was probable cause, but was there something that gave them permission to enter? Yes. What gave them permission to enter was what started this entire incident on that day, which was an abandoned trailer and truck which was partially blocking the roadway. And contrary to the reply brief, I did not switch theories. Those are descriptions of the same thing. There's an abandoned truck and trailer in an area known for illegal hunting, but the And so they are going, someone knows that might belong to the Ross family, so they have at that point, aside from whatever they may have known about stolen property and everything else that was going on out there with methamphetamine, they had the right to go see if there was somebody home who could come do something about the car that was blocking the road. And what's the scope of that right? They had the right to go knock on the door, so they had the right. But nobody answers what's the scope of their right. They can knock on the door, they can wait several minutes. I believe in this case they could walk and make sure that there's not someone that they're seeing. They know there's other family members who live out there. There could have been someone else at the home standing, you know, right there at the side of the house or something. That was not the case here. So once they walk up... Are you saying that they have a right under the knock-and-talk doctrine to explore generally the curtilage of the home? Well, I don't think they're going to be going out conducting a search of the curtilage, but certainly anything that they see... Can they step one foot into the curtilage if it's not in the direct path? You have to walk up on the porch on most homes to knock on the door, so you're on curtilage. But other than going up to the waiting to see if there's an answer and then turning around and leaving, what else is implicit in that license? Can you walk around the back and look on the back patio? You can walk around the back, I think, if there's a possibility that the person may use that back door to come and go. And I don't recall in this case whether there was testimony as to that or not. Well, what about obtaining the VIN numbers? It's one thing to check to see if anybody's on the side of the house or in the back or whatever, but why wasn't the collection of the VIN number just like pulling up the tarp in Collins? Because they did not have to pull up a tarp. They could see the vehicle or the ATV. But they walk up to the vehicle. I mean, the VIN number, it isn't, you know, it isn't on a billboard. I mean, you've got to get down and really look for it and you got to write it down. So, is that, aren't we a long way from a knock and talk by the time we're collecting the VIN numbers? We're certainly moved beyond the knock and talk because by that point... Okay, so isn't there a Collins violation at that point? No. They, at that point, have seen the ATV, the red ATV. They have taken a picture and sent to the victim who says, yeah, that's the stolen ATV. You're describing probable cause. You're not describing permission to enter the home. Curtilage is the home. In Justice Sotomayor's opinion in front door of the home and you walk into the curtilage. Are you telling me that any time an officer has probable cause that a crime might have been committed and evidence might be at the home, they can open the front door and walk in and search without a warrant? No, if they are, if they see something in plain view. Even if they see it in plain view, can they walk in and seize it without a warrant? I do not believe, no, they could not seize it. If I look, if I can see from the porch through the plate glass window that there's a red four-wheeler in the living room, can I then say, aha, walk into the house and copy down the VIN number, take pictures of the four-wheeler and send them around to see if it's stolen? They are not, no, cannot do that. Can you take pictures of the ATV through the plate glass window? You could take a picture through the ATV. So one question is whether they had a right to walk around and whether that was within the scope of the knock-and-talk, but let me ask you, was there any challenge below or above to the scope of the knock-and-talk, and specifically along the lines of what Judge McHugh is talking about, the license, the scope of the license in the walk and knock-and-talk. I don't recall No, there was not. No, the discussion about the knock-and-talk below centered on the issue of a cattle guard and whether that was an implied or a revocation of the implied license to allow someone to go in. But the idea of once you're, the fact that you can do a knock-and-talk and how broadly you can do a knock-and-talk, at least I didn't see any argument about that. They did not talk about the scope. They talked about whether or not you had a right to or had, that we argued, there was much argument about whether or not there was plain view and which road and was it a county road, was it a public road, but there was not a discussion about the scope of the actual knock-and-talk. I believe that part of that is because the court at that point, things went quickly. At that point there was a decision that we can see these things, we know they're stolen, even if we don't have been written down yet to verify exactly that this is the stolen ATV. They made a decision to get a warrant. They backed out, which was the appropriate thing to do. The wife came up, offered consent. They said, no, we'd rather wait for the warrant, which they did. And any of those items would have been sufficient to sustain the actions in this case. So it's clear that they did copy down the VIN number, right? They did. I don't recall whether they copied it down or took a picture of it, but I know that they did get the VIN. It's underneath the ATV. They didn't touch the ATV though? I don't think you had to touch the ATV. I think you could look. And I'm not going to make a representation as to, in the record, did they get down on their belly and look up or did they lift it up? I cannot tell you. That might be a distinction with the difference though, right? It might be. It's not something that I recall from the record at this time. Okay. Could I just move on to a second for the guidelines enhancement related to the firearms? As it relates to that, how many guns, in your view, were readily accessible? We had the AK-47 that had the silencer on it. It was in the gun rack and that was in the bedroom. We had the gun that was in, I think, a satchel, but it was over the ATV in the front yard. As far as I know, that's it, right? I mean, there were guns that were found in the shed, but those guns in the shed were, some of them were stolen, at least they turned out to be stolen. And they were, it's not, it would have really had to go out and sort of peel them out, then the two guns, including the one with the silencer, that were in the bedroom. I mean, so I'm looking at two. Do you have a different view? And my question is readily accessible, not guns on the property. I'm trying to think. The ATV, yes. I'm trying to remember the closet. For some reason, I am picturing like three guns in that closet in the master bedroom and I don't know where I'm coming up with that. Okay, but all right, then with that in mind, would it be whatever guns were in the master bedroom that the record holds and the gun that was on the ATV? Yes, mm-hmm. Yes, and the main emphasis would be those guns in the master bedroom because that is something that would have been accessible to the defendant, again, given the sheer volume of stolen property in this case that was somewhat astounding. Having those guns on hand was the connection with being able to protect that stolen property. And I think that we mentioned in our brief, this is not a case where you're going to have the guns set up perhaps at strategic locations throughout the home or maybe trapped or things of that nature. There are children in the home. This is not a defendant who could do all of that. The best he could probably do would be to keep them there near his bed so he could get to them. But in Ross, the case that the district court relied on, the guns were dispersed around the home. That made it look much more like you had them for ready access anywhere you might have to defend your ill-gotten goods. Exactly, and I think to the degree that he could, he did that. He had them in the bedroom. He had one on the ATV for when he was out going around property. And then there were the shed that I guess if he were out in that neighborhood, there was a gun accessible. Yeah, but I thought I think you were willing to go with the line that really the guns in the shed were, it seemed to me, that was the distinction with the difference. It's a question of how many guns were in that master bedroom. At least my recollection of the record was it was only one. There may have been only one. Let's assume it was the three. It's whatever guns were in the master bedroom and the gun that's on the ATV. But the one in the master bedroom, and it's, we're talking, it doesn't have to be multiple guns, right? I mean that Bass in that case, I think, actually focused on the quantity of stolen property as well as the firearms. And so we had a lot of stolen property, right? Yes, your Honor. I don't think that there's a requirement of a certain number of guns. And I think that the court found here that it was important that not only were there firearms around, there were actually stolen firearms around, which is probably the ones that are in the in the barn. We'd finally urge the court to look at the fact that here we had so much litigation. We had a suppression hearing. We had a challenge to the district court, an additional challenge to the district court, and then finally a bench trial. We would assert that that made it sufficient for denial of acceptance points. There was an easy way for this defendant to preserve his right to challenge the search and not put the government to the There was no conditional plea done that would have been the easy way to preserve this issue. Instead, the government had to call multiple witnesses for a hearing that took some amount of time for the district court. And the only reason that that was done was to get this one deputy on the stand that the defendant was fixated with. It wasn't just the one deputy. There were multiple witnesses at the bench trial, and it wasn't a decision that maybe conditional plea wasn't such a great idea until the record had been fleshed out further. After all, Agent Keck was not anywhere near anything that happened when all of these searches were being done, and he comes in and says, well, here's what the suppression hearing, and Mr. Ross never contested or claimed that he was innocent. He was just simply trying to to challenge the search, but he wanted to build out the record. Now, why isn't that a reasonable position to take? I notice my time has expired. May I answer your question? For two reasons. First of all, the defendant had the ability to subpoena that deputy for the suppression hearing. They did not do so. Now, I grant you she had a broken leg, but if that had been done, the magistrate could have continued the hearing, then they could have subpoenaed all of the officers if they wanted to. They did not choose to do that. By putting the government to a bench trial, at the bench trial, unlike a suppression hearing, we are not able to use hearsay. So we had to have everyone involved come testify about what they saw, and based upon that, we believe the court was correct in denying acceptance, and I think for the reasons set forth in our brief, this matter should be affirmed. Thank you, Your Honor. Thank you, counsel. Are you out of time? Okay. Case is submitted. Thank you.